**COMMODITY FUTURES TRADING COMMISSION, Plaintiff–Appellee,**

v.

**Gregg R. AMERMAN, Defendant–Appellant.**

**No. 15–11673.**

United States Court of Appeals, Eleventh Circuit.

March 14, 2016.

Anne Stukes, U.S. Commodity Futures Trading Commission, Washington, DC, Lena Amanti, U.S. Attorney's Office, Atlanta, GA, Daniel Alexander Caldwell, Iii, U.S. Attorney'S Office, Atlanta, GA, Rosemary Hollinger, Jon J. Kramer, Elizabeth M. Streit, David A. Terrell, U.S. Commodity Futures Trading Commission, Chicago, IL, for plaintiff-Appellee.

Michael B. Billingsley, U.S. Attorney's Office, Birmingham, AL, Robert Schwartz, U.S. Commodity Futures Trading Commission, Washington, DC, U.S. Attorney's Office, Atlanta, GA, for Defendant-appellee.

* Honorable C. Ashley Royal, United States District Judge for the Middle District of Georgia, sitting by designation.

Before HULL and JILL PRYOR, Circuit Judges, and ROYAL,* District Judge.

PER CURIAM:

This action arises under the Commodities Exchange Act, 7 U.S.C. §§ 1 *et seq.* (the "CEA") and accompanying regulations. Gregg Amerman appeals the entry of summary judgment against him on the Commodities Futures Trading Commission's ("CFTC") claims that he failed to register as a commodity pool operator, in violation of 7 U.S.C. § 6m(1), and unlawfully commingled commodity pool property, in violation of 17 C.F.R. § 4.20(c). He also appeals the district court's subsequent order of disgorgement.

After a thorough consideration of the parties' briefs and the record, and with the benefit of oral argument, we affirm.

I.

Because we write for the parties, we assume familiarity with the underlying facts of the case and provide here only what is necessary to resolve this appeal.

This case arises out of a separate, large commodity pool fraud case against nonparty Coyt Murray. Murray ran a Ponzi scheme involving a commodity pool called "Tech Traders." *See CFTC v. Equity Fin. Grp. LLC,* 572 F.3d 150, 152–53 (3d Cir. 2009). From 2002 through early 2004, Amerman found individuals to invest in Tech Traders for Murray, pooling the in-

vestment funds in an account controlled by Amerman's company, Dream Venture Group, LLC ("DVG"). Amerman was DVG's President and Chief Executive Officer. In that capacity, he entered into agreements with the DVG pool investors providing that DVG would use the investor's contribution to issue a loan to Tech Traders, memorialized by a promissory note in DVG's name.[1] The agreements also provided that the investors would share the profits from the Tech Traders investment on a pro rata basis. Amerman conceded that, between September 2002 and February 2004, DVG accepted $1,083,000 from at least 18 different investors and invested these funds in Tech Traders in DVG's name.

In exchange for Amerman's pooling of investments for Tech Traders, Murray contributed funds to three companies of which Amerman was the sole owner: World Alliance Group, Inc.; Gregg Amerman Companies, Inc.; and Zero Doubt, LLC (collectively the "Relief Defendants"). Rather than sending those funds directly to the Relief Defendants, however, Murray sent the money through DVG's investment pooling account. Three additional investors who were not part of the DVG investment pool sent money to Tech Traders directly, yet Murray sent the proceeds from these investments to the Relief Defendants through DVG's account as well. Amerman withdrew funds from the DVG account for his personal use. He never registered with the CFTC as a commodity pool operator.

Murray's Ponzi scheme collapsed, leaving the DVG investors with a significant loss. According to Amerman, as of March 17, 2004, eighteen investors (including Amerman himself) collectively were owed $1,137,593. According to the CFTC's investigator, who reviewed bank statements and other records, over the course of two years Amerman accepted into the DVG account $1,092,000 from individual investors, sending $1,083,000 to Tech Traders. In return, Tech Traders sent $1,278,475 to the DVG account; Amerman then disbursed to investors only $422,477, leaving $749,328. The record also shows that the DVG account received several thousand dollars from one of Murray's other commodity trading businesses and about $162,500 in deposits from Amerman himself. Amerman does not meaningfully dispute these figures.

The record further reflects that, during the relevant time, Amerman and the Relief Defendants took $1,060,135.79 from the DVG account, $647,809 for Amerman's personal use and the remaining $412,327 for the Relief Defendants. After accounting for credits Amerman was personally due, including $153,388 in commissions, the investigator determined that Amerman and the Relief Defendants received a "net gain" of $744,247.79. Doc. 70–3 at 21, ¶ 51.

Facing civil and criminal prosecution, Murray settled with the CFTC and pled guilty to criminal commodity-pool fraud charges. *See Equity Fin. Grp.*, 572 F.3d at 153 n. 5; *United States v. Murray*, No. 3:06–cr–0079–V (W.D.N.C. June 27, 2006). The CFTC then brought this action against Amerman and the Relief Defendants, alleging various violations of the CEA and seeking, among other remedies, disgorgement.

---

1. Amerman refers to the investors as "lenders" and asserts that the promissory notes were issued "to the individual lender." Appellant's Br. at 4. On the contrary, the record shows that the promissory notes were issued to DVG. Amerman then purported to assign the notes to individual investors, mostly on unspecified dates, but he fails to explain what difference these assignments make. We find none.

■ On the CFTC's motion for summary judgment, the district court ruled that Amerman was an unregistered commodity pool operator, in violation of 7 U.S.C. § 6m(1), and unlawfully commingled commodity pool property, in violation of 17 C.F.R. § 4.20(c). The court subsequently entered an order directing Amerman to pay $744,247.79 in disgorgement, representing the net gain from the unregistered commodity pool that he and the Relief Defendants together enjoyed, plus prejudgment interest, for a total of $911,922.97. The court also ordered the Relief Defendants to pay a total of $505,260.70, representing the net gain that each Relief Defendant received ($412,-326.82), plus prejudgment interest. The court held that Amerman was jointly and severally liable for the amount each of his companies was ordered to pay and that any payment of disgorgement by the Relief Defendants would be deducted from the amount of his personal disgorgement obligation.[2] This appeal followed.

## II.

We consider Amerman's appeal of the district court's summary judgment and disgorgement orders in turn.

## A.

We review *de novo* the district court's grant of summary judgment, construing the evidence and all reasonable inferences therefrom in favor of the nonmoving party. *Urquilla–Diaz v. Kaplan Univ.,* 780 F.3d 1039, 1050 (11th Cir.2015).

The CEA requires commodity pool operators to register with the CFTC. 7 U.S.C. § 6m(1) ("It shall be unlawful for any commodity trading advisor or commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor or commodity pool operator[ ]...."). A CFTC regulation prohibits commodity pool operators from commingling pool property with other assets. 17 C.F.R. § 4.20(c) ("No commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person.").

■ It is undisputed that Amerman did not register as a commodity pool operator and that he commingled funds of DVG's Tech Traders investment with other funds.[3] Amerman nonetheless argues that he was not liable for violating the registration requirement or the commingling prohibition because (1) DVG was not a commodity pool, and (2) he was not a commodity pool operator. We reject both arguments.

First, the undisputed evidence in the record establishes that DVG was a commodity pool. A commodity pool is "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." 7 U.S.C. § 1a(10)(A). A commodity pool is essentially a mutual fund for commodity interests. *See, e.g., Rosenthal & Co. v. CFTC,* 802 F.2d 963, 965 (7th Cir.1986). The *sine qua non* of a commodity pool is

**2.** The court also imposed a $30,000 civil penalty. In his opening brief, Amerman made a passing reference to this penalty, asserting without supporting argument or citation to authority that the district court improperly imposed the penalty. He thus has abandoned any challenge to the penalty. *See Sapuppo v.*

*Allstate Floridian Ins. Co.,* 739 F.3d 678, 682 (11th Cir.2014).

**3.** Amerman also does not contest that he used any means or instrumentality of interstate commerce in connection with his business of pooling funds in the DVG account.

"the aggregation of investors' funds into a single account." *CFTC v. Perkins*, No. 06–4674(RBK), 2009 WL 806576, at *4 (D.N.J. Mar. 25, 2009). "Typically the pool is organized in the form of a business entity that limits the liability of individual investors." *Equity Fin. Grp.*, 572 F.3d at 156. The record shows that DVG was a limited liability company that aggregated investors' funds into a single account for the purpose of trading in commodity interests through Tech Traders, such that each investor shared the profits and losses on a pro rata basis. Thus, DVG was a commodity pool.

■ Second, Amerman was indisputably DVG's commodity pool operator. A commodity pool operator is "any person ... engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds ... for the purpose of trading in commodity interests." 7 U.S.C. § 1a(11)(A)(1).[4] Even if we assume, as Amerman argues, that a question of fact exists regarding whether Amerman *solicited* funds for trading in commodity interests, the record leaves no room for doubt that Amerman *accepted* and *received* such funds. Amerman does not meaningfully dispute this fact.

Instead, Amerman raises three additional arguments, all of which we easily reject. First, he argues that a commodity trading advisor need not register with the CFTC unless he "furnish[es] commodity trading advice to more than fifteen persons" in a year, 7 U.S.C. § 6m(1), and the record does not show he provided commodity trading advice at all. This argument is beside the point. Amerman's registration violation derives from his status as a commodity *pool operator*, not a commodity *trading advisor*. *See* 7 U.S.C. § 6m(1) (requiring a "commodity trading advisor *or* [a] commodity pool operator" to register) (emphasis added).

Second, Amerman argues for the first time on appeal and without record citations that "[e]ven with evidence that [he] solicited, accepted, and received funds from DVG's investors, the summary judgment evidence does not establish as a matter of law that he did so as an individual [commodity pool operator] rather than as an agent of DVG." Appellant's Br. at 19. Amerman appears to argue that, if a commodity pool existed in this case, DVG was the commodity pool operator, and he was simply an agent of that "corporate [commodity pool operator]," Appellant's Br. at 17, "who may not necessarily be held liable as a [commodity pool operator] himself." *Id.* at 15. We decline to consider this argument, raised for the first time on appeal. *See Access Now, Inc. v. Southwest Airlines, Co.*, 385 F.3d 1324, 1331 (11th Cir.2004). But even if considered as timely raised in this case, Amerman's argument would fail because DVG was the commodity pool and thus by law could not have been the commodity pool operator.

---

4. Amerman relies on *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880, 884 (9th Cir. 1986)—a case providing a four-factor test to determine whether an investment organization is a commodity pool—to argue that he was not a commodity pool operator because he did not solicit funds. Although the Ninth Circuit used the term "solicit[ ]," *Lopez*'s holding concerned the third factor, whether participants shared pro rata in profits or loss-es. *Id.* Thus, the Ninth Circuit did not hold in *Lopez* that to be a commodity pool operator, a person must solicit funds into the commodity pool. *See id.* Further, to require solicitation would be inconsistent with the language of 7 U.S.C. § 1a(11)(A)(1), defining a commodity pool operator as one who "solicits, accepts, *or* receives" funds into a commodity pool. 7 U.S.C. § 1a(11)(A)(1) (emphasis added).

*See* 17 C.F.R. § 4.20(a)(1) ("[A] commodity pool operator must operate its pool as an entity cognizable as a legal entity separate from that of the pool operator."). In other words, because DVG was not the commodity pool operator, Amerman would not have been acting as DVG's agent when he accepted funds for the commodity pool.

Third, Amerman argues that he was not a commodity pool operator because he did not invest in commodity futures directly, instead sending DVG's investments to Tech Traders for commodities investments. Contrary to Amerman's argument, "the statute does not require a commodity pool operator to execute commodity futures transactions." *Equity Fin. Grp. LLC*, 572 F.3d at 158.

The undisputed facts show that Amerman was an unregistered commodity pool operator who unlawfully commingled funds of the DVG commodity pool with other funds, in violation of 7 U.S.C. § 6m(1) and 17 C.F.R. § 4.20. Accordingly, we affirm the district court's entry of summary judgment.

### B.

The CEA authorizes district courts to impose equitable remedies, including disgorgement, upon a finding that the defendant has violated any of its provisions. 7 U.S.C. § 13a–1(d)(3)(B). The CFTC need only "produc[e] a reasonable approximation of a defendant's ill-gotten gains" to support a disgorgement order. *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir.2004) (considering an analogous case under the Federal Securities Act of 1933 (the "Secu-

rities Act") and the Federal Securities Exchange Act of 1934 (the "Exchange Act")). Although this burden is light, "the power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir.2005) (internal quotation marks omitted). Once the CFTC satisfies its burden, "[t]he burden then shifts to the defendant to demonstrate that [the CFTC's] estimate is not a reasonable approximation." *Calvo*, 378 F.3d at 1217. "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* (internal quotation marks omitted) (alteration adopted). We review a disgorgement award for abuse of discretion. *See id.* at 1217–1218.

█ Amerman attacks the disgorgement order on three fronts, none of which warrants reversal. First, Amerman argues that the district court abused its discretion in declining to hold an evidentiary hearing.[5] Where a defendant contests the calculation of a disgorgement award and prejudgment interest and requests a hearing to resolve this dispute, a district court may abuse its discretion in declining to hold one. *SEC v. Smyth*, 420 F.3d 1225, 1231 (11th Cir.2005) (drawing from Fed. R.Civ.P. 55—requiring that the district court hold an evidentiary hearing before entering default judgment when the amount sought is not for a sum certain or cannot be computed to be made certain—

---

**5.** We reject Amerman's suggestion that the district court should have offered him an opportunity to file a reply to the CFTC's response to his objections to the CFTC's proposed disgorgement order. On April 23, 2013, the district court directed the CFTC to file a proposed injunction and disgorgement order, provided Amerman ten days to object, and

granted the CFTC leave to file a reply within ten days of Amerman's filing his objection. At no point did Amerman request leave to file an additional brief addressing disgorgement. Further, Amerman fails to identify the arguments he would have raised or explain how they would have affected the disgorgement order. This is a non-starter.

and holding that the district court abused its discretion in declining to hold a hearing in an SEC disgorgement action where the defendant contested the amount sought).

Amerman did not request a hearing, but he argues that the court should have held one nonetheless. His principal argument in support of a hearing is his misplaced assertion that the CFTC must prove reliance by each customer in order to award restitution. But Amerman concedes that the CFTC did not seek restitution; it sought disgorgement, which focuses on "ill-gotten gains," not the victim's losses. *See SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978) ("The purpose of disgorgement is not to compensate the victims of fraud, but to deprive the wrongdoer of his ill-gotten gain.").[6]

He also argues, without legal support or elaboration, that the district court should have held a hearing because "there are issues of fact as to Amerman's scienter." Appellant's Br. at 11. According to Amerman, this factual dispute precluded summary judgment, and thus the district court should not have reached the issue of disgorgement. Amerman's scienter is irrelevant to his liability in this case, however. *See* 7 U.S.C. § 6m(1) (containing no terms such as "knowing" or "willful," which connote a state-of-mind requirement); 17 C.F.R. § 4.20(c) (same); *see also Pinter v. Dahl,* 486 U.S. 622, 638, 108 S.Ct. 2063, 100 L.Ed.2d 658 ("The registration requirements are the heart of the [Securities] Act, and § 12(1) imposes strict liability for violating those requirements."); *Aaron v. SEC,* 446 U.S. 680, 713–714 & n. 5, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (Blackmun, J., concurring in part and dissenting in part) (recognizing that, by declining to use terms connoting a state-of-mind requirement, the Securi-

ties Act and the Exchange Act did not impose such a requirement for some violations, including registration violations); *Messer v. E.F. Hutton & Co.,* 847 F.2d 673, 679 (11th Cir.1988) (relying on an interpretation of an analogous provision of the Exchange Act when considering a scienter requirement under the CEA). To the extent Amerman argues that scienter may be a relevant factor in assessing whether disgorgement should be awarded, he cites no legal authority, and we have found none. To the contrary, the CEA contemplates "disgorgement of gains received" upon a "proper showing [that a person has] committed *any* violation" of the CEA or CFTC regulation. 7 U.S.C. § 13a–1(3)(B) (emphasis added). "[A]ny violation" includes registration violations. The district court did not err in declining to hold an evidentiary hearing.

Second, Amerman argues that the amount of ill-gotten gains is in dispute. According to Amerman, "[i]ll-gotten gains in this scenario are those funds derived from commodity pool operation." Appellant's Br. at 12. Amerman seems to argue that Tech Traders's "investment" in the Relief Defendants, which was routed through the DVG commodity pool, was nonetheless completely separate from the commodity pool and thus not "derived from commodity pool operation." *Id.* The undisputed evidence in the record shows, however, that to the extent Tech Trader invested in the Relief Defendants through the DVG conduit, its investment was in exchange for Amerman's pooling of commodity investors. Thus, the "investment" Amerman enjoyed was a product of his unregistered commodity pool and, therefore, by his own definition an ill-gotten gain. In any event, Amerman has failed to point to any evidence that the funds trans-

---

**6.** Decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981, are binding on this Court.

*See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

ferred into the DVG commodity pool were earmarked for Amerman and his companies, rather than for the commodity pool investors who, Amerman concedes, are owed about $1 million.[7]

Third, Amerman argues that DVG should have been joined as an indispensable party under Rule 19 of the Federal Rules of Civil Procedure. In relevant part, Rule 19 provides: "A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties...." Fed.R.Civ.P. 19(a)(1). Amerman argues that DVG was an indispensable party because "DVG was party to all of the agreements with the pool investors and Tech Traders," and "[a]ll solicitations of funds were done in the name of DVG, not Amerman." Appellant's Br. at 15. Again, Amerman's premise is that he was merely the agent of DVG, which was the commodity pool operator. Apparently, according to Amerman, DVG should be on the hook for his wrongdoing. We rejected Amerman's agency argument above, and he offers no other reason why DVG would be an indispensable party under Rule 19.

The district court did not abuse its discretion in ordering disgorgement without a hearing. We therefore affirm the district court's disgorgement award.

## III.

For the reasons set forth above, we affirm the district court's judgment.

**AFFIRMED.**

---

7. Amerman also argues that his separate act of wrongdoing—commingling of funds—makes it too difficult to estimate the amount of disgorgement. This argument fails because

"any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Calvo*, 378 F.3d at 1217 (internal quotation marks omitted).